Everybody ready? This is the case of Joseph Ellis versus the ICC Group, Inc. doing business as the Eleanor Constructions Corporation and WBK Engineering LLC. Our procedure basically is we let the appellant proceed for 10 to 15 minutes and then we ask questions. We only interrupt if something is somewhat unusual. Then the appellee proceeds and does the same and then there's the closing. You have before you Justice David Ellis, Justice Cynthia Cobbs, and Justice James Fitzgerald Smith. And with that, the appellant may proceed. Thank you. May it please the court? I'm going to ask you two quick questions though. Try to make sure you address the condition of the land and also the deliberate encounter exceptions. All right. With that, go ahead. Thank you. Mariam Hafizi for the plaintiff appellant Joseph Ellis. As I'm sure the justices have read in the briefs, there's three issues before the court. The section 414 retained control, the premises liability count, and then the issue of proximate cause. In the retained control, I think this is a pretty clear-cut case of retained control based both on the contracts and on the actual behavior of the defendant general contractor ICC. To me, this one's not a close call based on all of the case law that exists on this matter. In this particular case, in the cases where retained control was not found on the part of the general contractor, it was a situation where the general contractor was either so fully removed from the situation that they could not have... For example, they didn't build the scaffold or they didn't place a certain thing there. Those were the... Or the plaintiff did something completely on his own, like showing up and moving the drywall himself to check for something behind it and it fell on him. Those are things where no matter what the responsibility of the general contractor was or should have been, it wouldn't have affected the outcome for the plaintiff. In this case, like in the cases where retained control was found, if ICC had done their part to make sure that there was safe access across the dam gate from side to side, Joseph Ellis and all of the other tradesmen for that matter would not have encountered this danger, this condition on the land of the dam gate that's five feet tall, it's erected at five feet tall. And so if Joseph Ellis had had that safe means of access available, he would never have fallen because he didn't fall because he slipped off the bottom rung of the ladder. He didn't fall because he fell when he was trying to pivot himself back over the dam gate itself. And so it directly relates back to what the general contractor should have done as part of their responsibility for safe means of access and coordination on the job site for all trades people on the job site. Under premises liability, the condition of the land is the dam gate that's there, but that's what's under the premises liability. But there is the issue of the safe access over the dam gate and a failure to provide or recognize that there is a dangerous condition is premises liability. And the fact that ICC constructed the platform ladder after the day after Joseph Ellis fell, even though ICC's own carpenters did not have any more work to do, according to them, on either side of the dam gate, but they still built that platform ladder for those that still had work to do, demonstrates that it was their responsibility as a general contractor to do so. Now the deliberate and counter exception is the same issue. So you can't, the open and obvious condition is that it is dangerous to traverse over this very small platform with this five foot tall gate. And that's open, obvious, it should be open and obvious to everybody. And if it's open and obvious for Joseph, it's certainly open and obvious for ICC who is access in and around the job site. But Joseph Ellis still had the deliberate and counter exception that applies to him because he was doing his job to get the servo pulled and wired and to complete the work he was specifically sent over to do that day on this job site before he was returned to his original job site. And so the issue of whether he could have done something else or chosen to alert somebody else or ask for certain help or anything else goes to the issue of comparative liability, which I think is really the biggest issue in this case. And that's why in terms of the issues that are a matter of law, retained control, premises liability, proximate cause, those are all pretty clear cut under as a matter of law. The issue of comparative liability or comparative negligence is a jury question that is certainly going to be a hard fought one for both sides, because we're going to say that the ICC was responsible for the planning, they had months advance notice, they had a week's worth of notice of this actual dam gate, Joe had one day and one moment. And that's a comparative liability issue. But that's not proximate cause, that doesn't absolve them of retained control, and it doesn't of their responsibility to have a safe premises. And so I would turn it over to the court if they have any questions. I guess I'm mainly concerned about the scope of the duty here. And it seems to me that the defendant keeps transferring the burden of control of the land, which I feel he created a condition of the land when he took charge of the dam. So I'm more concerned that this is more of a premise liability issue as to that portion, meaning he had absolute control over that portion. The employees of the other subcontractors, they still were directed by the general contractor. But the general contractor had absolute control, I think over that specific area. I don't know if you agree or disagree. I agree that the general contractor had full control over the entire job site and that they were fully responsible for general access to and around the job site. And so when there's a slope that comes down, it's a high hill from the bridge down to the platform, they were responsible for constructing a handrail to allow for all of the tradesmen or anybody else on the job site to come down. Just like they built the wooden platform after he fell, that was their responsibility to create the safe access. Joe didn't create the dangerous condition when he put those two ladders together. He was trying to solve the problem of the dangerous condition. And that's what goes to the comparative negligence. Was it the right call that he made? Was it the right choice that he made? Could he have done something different? That's for a jury to decide how much fault he has. But in light of the fact that this is a construction site, he's an electrician, he's doing his job that he was tasked to do that day. It'd be hard pressed to find more blame on him for trying to get the job done, just like all the other tradesmen were trying to do, as you saw in those photographs of them, all kinds of ways climbing over the platform or the dam gate while ICC stepped back and let it happen. And then when somebody unfortunately got injured, they're like, well, it wasn't our responsibility. Of course it was your responsibility, just like it's your responsibility for all safety on the job site. They were there every day. There was a site superintendent. There was a project manager who was in office every day. They were the ones doing the meetings with the village. They're the ones reporting on what's going on with the village. The electricians were not there for that reason. So all of the control falls back on the general contractor. Can I just, oh, I'm sorry, Justice. This is my turn. No, no, go ahead. Thank you. Just with respect to the issue of retained control, do I understand your definition or your characterization of retained control go to a provision of the safety implements or otherwise? I think that retained control, as according to all of the law in the books, it starts with the contract. And then you also look at the actual actions of the defendant in question. And in contracts here, we have the subcontract agreement that specifically places the responsibility of safety or the subcontractor electricians to follow the safety rules put forth by the general contractor for this site. And there's a site-specific safety plan that's referenced that they're to adhere to. And even though Lyons and Pinner, which is the electricians, even though they had their own safety plan in existence, that was actually not incorporated into their subcontract agreement. They were to follow ICC's safety plan. They were to look to ICC for all directions on this. And while they weren't going to tell the electricians necessarily how to pull the wire, this is not an issue. This case is not an issue of specific electrical work where ICC was not actually controlling those tiny aspects of the way that they do their work as electricians. That's what they're professionals for. This was an issue about access, safe access to the site to do their work. And then their behavior, ICC's behavior in this case, further falls within the definition of retained control, which is that they demonstrated that control by what they did or should have, what they did after he fell, which was construct that with how retained control is defined in the restatement? I believe so. In Kearney, they described it very, there's always some variation, but it always starts with the contract and it also looks to the behavior. Is there something that seems that correct? And under that, the supervisory control, the power to direct the order in which the work shall be done or to forbid it from being done. That's in the definition under the case you were just citing. That doesn't seem to fit totally with what you're saying. One of the elements that's looked at is whether they have the right to stop work, control the work, and they did. They did have the right to stop work and Lines and Pinner would have had to listen. All of the Lines and Pinner, I'm sorry, all of the ICC employees did confirm that the Lines and Pinner employees, as well as any other tradesmen on the site would have had to listen to them if they said to stop work for any reason, including safety reasons. Well, the general contractor always has that power, right? And doesn't the restatement have a comment in it that discusses the fact that we're not just talking about that general right? Something more specific to the actual work being done. A general contractor is always going to be able to walk onto a site and tell the sub stop working. But, and which is I think what you're talking about, but doesn't the restatement suggest that it has to be more than that? It does. And in this case, that's why we look at the subcontract agreement between ICC and Lines and Pinner, which specifically requires Lines and Pinner to adhere to ICC site specific safety plan for this job. And that they are to look to them specifically for all orders, all instructions, all coordination. The contact person in there is the site superintendent for ICC. It's not referred to their own foreman for any questions. All of it always directs back to ICC for all questions, including safety or otherwise. I think we're really just talking though, more generally about a degree of control, but wouldn't it be, don't you think that the restatement is really talking about when it talks about retaining control, it's really actually talking about a higher level of supervisory authority over the sub? I referenced in the, in the brief that the analysis by the courts of this is that in, it says in, for example, in DRACY, this court said in order for the rules state in the section to apply the restatement, the employer must have retained at least some degree of control over the manner in which the work is done. And that's where it goes into, it's not enough just they have a general right to start and stop work or things like that. But, and that's why we talked about the specific things that ICC had in this case that retained control over this entire job site and what Lines and Pinner was doing or should have been doing that day. Who was on site at the time that Mr. Ellis, you know, constructed the dual ladder contraption? It was, it was Kevin McLaughlin, who was the Lines and Pinner foreman and Joseph Ellis, those were the two electricians. There was another tradesman from RJ O'Neill, an iron worker, and there was the engineer from WBK. But ICC had no one present at the time? Yes, and that actually is interesting to me because they use it as a defense that they had no notice, but he should, the site superintendent should have been there. He left early from the job site of his own volition. Actually, he has two stories. One is he left the job site early to pick up checks and he went home, got a phone call at home about what had happened. But according to his deposition testimony, he said he had shut down the job early in the morning and sent everybody home. So somehow that message didn't make it through to the very same people that were there in the morning. So it demonstrates that he should have been there, would have been there, and certainly I don't think a defense that he wasn't there, that they didn't have notice of that setup. I have nothing further. Any further questions? No. Okay, Matt, you may proceed. Thank you. First, I just want to confirm, can you hear me? Yes. Thank you. May it please the court, my name is Matt Stephens. I represent Apelli Illinois Constructors Corporation, known as ICC. Before we turn to the legal analysis, I'd like to briefly touch on the key facts that are not in dispute in this case. Ellis set these ladders up by himself. Ellis tied these ladders together by himself. He had never tied ladders together in this manner before. Ellis had his own foreman, Kevin McLaughlin, standing right there with him. He did not ask McLaughlin for some alternative means to cross the dam gate, and Ellis certainly never asked anybody else at Lyons and Pinner for an alternative means to cross the dam gate, and Ellis never asked ICC for an alternative means to cross the dam gate. The record is clear that nobody asked ICC to provide a job belt ladder or any other type of ladder. What's not in dispute about the actions of ICC is that ICC never observed Ellis's improvised ladder setup, which by his own estimation existed for 30 to 45 minutes before the action. ICC never directed the means for Ellis or Lyons and Pinner to either cross the dam gate or to stage their work in such a way that they would be pulling wires or connecting a servo south of the dam gate after the gate was up. ICC's testimony is clear that they did not expect anybody to work on the south side of the dam gate after it was erected on October 20th and 21st. With regard to the subcontract between ICC and Lyons, there's no dispute that Lyons and Pinner was a specialty subcontractor, higher boards expertise, and that it was required to provide all of labor materials and supervision for its own work, explicitly including scaffolding equipment. There was some argument by Ellis's counsel that maybe the job belt ladder is not scaffolding equipment, but I think it's clear here the subcontract required Lyons and Pinner to provide everything it needed to get the job done. There's absolutely no contractual exception for job built ladders. If Lyons and Pinner wanted a job built ladder, they either could or didn't either of those things in this instance. I think the first issue and dispute here is duty under 414. I think the question here is whether Ellis's act of setting up a hastily improvised ladder at a time when ICC was not even present gives rise to a duty by ICC to either prevent him from using that ladder, despite the fact that his own foreman is in there, or provide an alternative means of access. Plaintiff contends this is not a ladder case, that it's separate from Joyce or Mastery, sorry, Joyce v. Mastery or Calderon v. Residential Homes or Cochran v. Solid. And their distinction there is to promote their argument about access within the job site is that those other cases involve people working from ladders as opposed to accessing their work area. However, there's two problems with this. First, none of these cases address the alleged duty by Mr. Ellis's counsel of access within a job site. Second, in Joyce v. Mastery, the plaintiff was climbing a ladder that he himself set up when it retracted on him. So he was not working from the ladder, he was using the ladder for access. Similarly, in Calderon, the plaintiff was working for a roofing subcontractor, climbing a ladder with a bundle of shingles when he fell while trying to transfer from the ladder to the rooftop. So again, he wasn't shingling from the ladder, he was using it for access. Those are cases that this court well knows found there was no duty owed by the general contractor. And at least in the Calderon case, that ladder setup existed for a matter of days as opposed to the 30 to 45 minutes that Ellis's ladder setup existed. I don't want to go too far down a case. General contractors would have a duty to provide access to all areas of site at all times, regardless of who was scheduled to be there. That might work at a Home Depot, but this is a construction site, things have to be staged. ICC had no notice that Lyons was going to be concluding some work on the south side of the dam gate. McLaughlin clearly testified to that. A plaintiff in their appellate brief also makes a reference to a general negligence theory that ICC has somehow waived an argument on this. But again, plaintiff has presented no case law to support a theory that there's some kind of general negligence separated from a 414 analysis, particularly when we have an injured subcontractor suing a general contractor for bodily injuries on the site. Turning to the premises question, which I assume the justices want me to address yes early. Okay, I think it's clear that the gate itself was a condition of the land, as Judge Van Tine ruled. I think the timing element is critical here as well. Lyons and Penner safety manager and project manager, Mr. Ott and Mr. Turfdick, both testified that even if there was a job belt ladder present at the site, they would have needed to inspect it before any Lyons and Penner employee could use it. So even if Ellis had told McLaughlin, I don't want to cross the gate this way, we need a job belt ladder. And even if McLaughlin had relayed that to ICC, and ICC had built the ladder, they would still have needed Lyons and Penner safety people to come out and inspect the ladder before Ellis could cross it. The point of this is to say, there's no duty on ICC to anticipate that the need for access over the gate is going to be the moment that Mr. Ellis deems it necessary to cross over the gate. We don't have a contention in this case, as we do in so many other construction cases, that there was time pressure, that the ICC was pushing Lyons and Penner to get this job done. In other cases, we have a foreman pushing a worker, saying you need to get it done. We don't have that here. In fact, we have the contrary. We have Kevin McLaughlin, plaintiff's foreman, testifying he neither wanted nor needed Ellis to be on the south side of the dam gate. We have Kevin McLaughlin, the plaintiff's foreman, testifying he was fine with the way that he, McLaughlin, crossed the dam gate. It would be an enormous burden to impose on ICC to say, you've got this dam gate. You need to anticipate that some Lyons and Penner's workers, not all of them, but some of them might not be comfortable with it. And you need to anticipate that this is going to be a virtually instantaneous action. It would be like strict liability on a general contractor, if that were the case. And if that were the case, what if they wanted a ladder for work somewhere else? The general would have to provide that. And certainly our case law for those ladder cases has indicated that's simply not the duty of a general contractor under Illinois law. The dangerous condition that existed was certainly not the dam gate. It was readily apparent out in the daylight. Everybody could see it there. The dangerous condition was Ellis's hastily constructed. As I said, this existed for at most 30 to 45 minutes before the accident. Even if ICC had a superintendent there, the testimony from McLaughlin was that they had started pulling wires about a football field 100 yards away from where the dam gate was. So there's certainly no expectation that ICC had to be watching the dam gate in particular like a this accident occurred towards the end of the workday. And there's no indication from Lampson that he was supervising all the different activities that went on on the site throughout the day. I think the time factor is critical here. This was 45 minutes of a dangerous condition that Ellis himself set up, and that there is no actual notice to ICC. I realize in plaintiff's brief, they say the show workers on the south side of the gate. But as we detail in our brief, there is no testimony to say those workers were there between the 21st and the 28th. And they could very well have been there simply as part of the action of erecting the dam gate, which was scheduled for the 20th and the 21st. I would finally point out with regard to the premises, for Lyons and Pinter, Mr. Ott, their project manager, Mr. Turvedik, their safety manager, they visited the site after the gate was installed on the 20th and 21st, and before the accident on the 28th, and they didn't see any safety issue. They didn't know that Lyons and Pinter's in this case is Kevin McLaughlin. And he never told that to ICC, and he never asked ICC for access. One additional point I'd like to make, the subcontract in section 8.1 clearly states, its title is obligations derivative. It says the subcontractor binds itself to the contractor under this agreement in the same manner as the contractor is bound to the owner under the contract documents. This same type of pass-through provision was cited with approval by this court in the Joyce case, and I think it shows that the general contractor, whatever duties it owed to the village of Elk Grove, have been delegated down to Lyons and Pinter. I somewhat disagree with Ellis' counsel's contention that where the subcontract requires a particular person from ICC to be named as a contact, that that means Lyons and Pinter employees are to go to that person. We have no facts to say that ever happened, but I think a much fairer reading of that contract is it says ICC is designating a single person for Lyons and Pinter to contact. That avoids confusion over who to ask about what. With that, I would like to point out Judge Van Tine granted summary judgment on the basis of duty, approximate cause, and notice, and found that the gate was a condition rather than the cause of the accident. I ask that these justices affirm that ruling, and I'll take any questions you may have. One thing that you didn't address is the fact that the general common practice or custom in each of the subcontractor supervisors indicated that this was unusual that there was no setup that addressed that issue, which was the common practice of a general contractor, especially I was talking about his 32 years of experience and the others mimicking him, so I don't totally agree that you're off the hook. I believe that timing is such a critical aspect of this. There's no indication that ICC knew Ellis was going to be there. If Lyons and Pinter had requested a job built ladder, if Ellis could have just waited a couple of hours to have that request go up through the chain, I don't think we'd be sitting here today. It's not the case that ICC refused to provide access. It's the case that nobody ever requested it. Doesn't that, though, just go to the degree of fault, that the failure that Ellis didn't wait that he moved in his and McLaughlin's own time as opposed to pausing to ask for a manner of access? Absolutely. Miriam, I agree that will be a hotly contested issue, but I think the notice affects the foreseeability to ICC and its duty, and I think the foreseeability is part of the proximate cause argument as well. Lyons and Pinter was free to request this, but they just didn't do it, and ICC did not know they were going to be working south of the dam gate, just as the other people from Lyons and Pinter didn't know that. I'm curious, at the site, was there signage at the site that identified the general contractor? Now, when you're driving past the job site, you might see Walsh, or you might see some other signage up there, and it's gated maybe, but there's big signage so that you know this is the general who's kind of like in charge of this project. Was there signage that identified Illinois Constructors Corp as the general? Justice Cobbs, I have to admit I am simply not aware of any evidence in the record either way on that issue. I would assume that there was, but I honestly can't tell you that there's evidence either way. And this may not ever have come up in the context of the motion for summary judgment, but just based on what your general knowledge might be, when you see that signage posted, do you get a sense that it's the GC that's kind of like in charge of that area or is controlling that space, at least for the time that that huge signage is up there? I would certainly urge my GC clients to just use the signs as a means of advertising rather than dictate any contractual terms as to who's in control at any one particular moment. I think control over areas can shift as well. This case has not gone into detail on sequencing, but for a general contractor, for example, to say, oh, somebody might be here, let's put up a job belt ladder. I think it's much more complex than that. Somebody has to figure out who else is going to be working in that area. For example, McLaughlin looks like he was going to the south side of the dam gate to complete some wiring. You can see in the photos some of the conduit already up there and he was presumably going to pull wires through there, make some connections to the servo. Exactly where this ladder gets placed could interfere with the electrician's work. But what we don't know is whether or not there is any other trade that needed to do some work on the south side. So I don't think it's nearly as simple as just, oh, you put up a ladder there. Why not? It's easy. It's cheap. Because it can interfere with the work of various trades going on. Thank you. Any further questions? If I could briefly, Mr. Stevens, I want to make sure I understand you. Are you suggesting that the idea that people would cross over the dam gate was completely lost on ICC, that they didn't know there was ever going to be work done on the south side? That's what the testimony has been. Once the gate was erected, and we believe the photos from the 20th and the 21st show the erection crew, ICC did not anticipate any further work was going to be done there. I don't think that means that they forbade work from being done, that they had sealed it off in any way. It's clear that while ICC maintains a schedule, it's a general schedule. It doesn't predict the precise movement of any one person. It helps with the general sequencing. ICC put up the gate, though, right? The dam gate? Its workers were involved in the erection, correct? Yes. Right. Do you think it would be reasonable to infer that when they did so, they knew that it was going to make it awfully difficult to access the south side? Presumably, that's one of the reasons why they waited to erect it until later in the project, when they believed all the work had been done. There's no testimony that McLaughlin or anyone from Lyons and Pinner, well, McLaughlin's the only one that knew work was going to be done there. There's no testimony that anybody had remaining work to do on the south side. Okay. Let's change the hypothetical a little bit and pretend that they knew there was still going to be work done on the south side. Would you have a different feeling about your client's duty? I think it would depend on who was doing the work and what the nature of the work was. Why? If it was something where a man lift would be used either way because of the weight of some equipment, ICC could go ahead, erect the dam gate, and then just allow the workers to use a man lift to get to the south side. Okay. So, your position is ICC, before erecting the dam gate, talk to whoever they needed to talk to farther down the chain, closer to the work site to ensure that the work was done on the south end. That's what you're saying the deposition testimony shows? I don't believe that it's been characterized that way. Okay. Why don't you put in your own words? I'm sorry. My understanding from the deposition of Scott Lamson, he was the ICC superintendent, was that his understanding was that the trades had completed their work on the dam gate as of October, sometime prior to October 20th. So, they went ahead and erected the dam gate. I don't believe that there's any more detail, and I could be mistaken, but I don't believe there's any more detail that he double-checked that and that he confirmed. Did he indicate who told him that? If he did, I simply can't recall. I'm not aware of that answer, but I thought you might be. Okay. I think scheduling from the general contractor's perspective, and I am talking a bit in general here, is that they lay out the broader aspects of the schedule, but rarely, if ever, do they prohibit anybody from going back and tying up any details. Punch list work is never done until the very end of the project. So, I think saying that work had been done there does not mean a guarantee that nobody would set foot on it. It means the predicted work isn't done, but there could very well be something that had to be done later with a man lift or some other means of access. But if it's predictable that there could have been more work done on the south side, isn't another way of saying that is that it was foreseeable that there might be workers trying to traverse the dam gate to get to the south side? I may have overstated that case. What I meant to say was that they didn't forbid access at that point. If someone wanted access or wanted a job belt ladder, they simply strike that. If somebody wanted a job belt ladder, the simple procedure is to ask for one. Nobody has said that ICC would refuse it. I think that's why I think the timing here is so critical. If somebody would have just said we need a job belt ladder, that presumably could have been accomplished. All the witnesses who testified about it said it certainly would be considered and done. Okay. All right. Thank you very much. Just backing back to your timing discussion and maybe just a little different. When exactly was the Lions retained as subs? I'm more interested to know when they walked the job, if they did walk the job, what did they see, did they know at the time? Justice Cobbs, I have to admit I don't know the exact date. Off the top of my head, I do know that McLaughlin, the foreman, testified that he had been at the project for weeks prior to the date of the accident. I also know that the subcontract explicitly states that Lions is accepting the conditions of the project as part of its bid and its subcontract. Thank you. Any further? All right. Miriam, you may proceed. Thank you. I'm just going to jump around a little bit. The first thing that Mr. Stevens discussed that were undisputed with respect to what Joseph Ellis did on that day are completely the issues of comparative negligence that we're going to have to contend with in this case that has nothing to do with whether or not ICC had its own duty and responsibility to Joseph Ellis. There was a lot of talk about Lions and Pinter could have done this or Lions and Pinter should have done that, or Kevin McLaughlin did not. But Lions and Pinter is not a defendant in this case. They have been let out of this case. Again, what they did in an empty chair defense is again an issue for the jury to decide and for the verdict form decision to be made, but it doesn't absolve ICC of its own independent responsibility in this case. The time factor is critical in this case, and the time starts when ICC was granted the bid for this project in July of 2015 and started the work. They are the ones who then later subcontracted with the various subs to complete the work. At all times, they should have known of what was going to be going on on any particular day, let alone weeks, because they created not only the overarching baseline schedule for the project, but they did three-week lookaheads that were presented and modified at each of the weekly meetings that they had with the village and the engineers. They are the ones who reported on what work had been completed, and in order for them to be able to coordinate all of the different subcontractors on this very small job site, they had to know or should have known exactly what was going to be done and what equipment might be needed and what access might be needed, because this isn't something where someone might be working in this floor, that building, and someone might be working on this floor. This is all, we're talking a very, very small site. Mary, I'm just going to jump in, but wouldn't Lions have known the same thing? Yes, but they're responsible for bringing the equipment in order to do their electrical work, meaning they have to bring the right wires, they have to bring the right tools to pull wire. They don't have the responsibility to create safe access on the job site. That is the job of ICC, and it's ironic because it keeps going back to, well, if only they had asked ICC for a job built ladder, this wouldn't have happened, except that throughout the case, they have denied that it was their responsibility at all to have a job built ladder, and that even if there was one, and even the one that they built was not for anybody other than ICC employees. Again, this goes back to this issue of genuine issue of material fact. ICC itself has its own conflicting testimony and evidence about what its responsibilities were and what could have been a question for a jury to decide what was their real duty here and what was their responsibility. Again, for them to not expect anybody to do any work when the dam gate was actually erected, again, goes against their own look ahead, because this was the conversion of a standard dam into a hydraulic dam, meaning it needed to be wired, and that's why there was iron workers there to actually install the hydraulics so that it would move, and the electricians so that it would have the electricity to respond. So, of course, they have to do that after the dam gate is installed. So, the idea that all work was done once the dam gate was installed is simply against the actual evidence in this case and also logic. The site superintendent for ICC should have been there that day, but regardless of that day, because it keeps going back to this focus of this one hour or so when Joe Ellis went through this, this is an issue that happened for a week prior once this dam gate was installed, and the photos that show the other tradesmen, whether or not that was the installation of, it was very dangerous what they were doing. They were not in proper, oh, the word is escaping me, the things to hold your harnesses or other things to keep them from falling. Any terrible thing could have happened similar to what happened to Joseph Ellis to any one of them, and ICC saw that happen and did nothing. That is their liability in this case, and that's why the issue of comparative negligence will be so hotly debated. ICC had that duty to create a safe job site, to create access to and among the job site. It's in the contract for all of the workers to do what they needed to do, and it's evidenced by what they did the day after he fell. They could have done that a week before, and they didn't, and so now they want to place all of the blame on Joe when he was just doing his job at that time trying to get the work done. An issue of comparative negligence for sure, but not so a lack of proximate cause or retained control or premises liability absolution for ICC. Oh, and if I may, I just want to address the case law that Stephen said. In Joyce, the ladder retracted on the plaintiff. It was a defective ladder that had nothing to do with what the general contractor did or didn't do. In Calderon, there was a construction manager, and it was a residential home build, and this was a roof for climbing up, and he fell down when he was carrying shingles up. There was no general contractor. It was a construction manager in an office saying, here's the jobs for today, and in Cochran, the ladder that had been placed atop two milk crates was placed by a subcontractor, not by that the plaintiff didn't work for, and so that's why it wasn't the general contractor's responsibility because they're not the ones who constructed that dangerous condition, and in Wilkerson, which the defendant doesn't want to talk about, in that case, the plaintiff was working without proper fall protection. He was acting carelessly. He certainly knew better, and he fell, and the court still found that the general contractor still had its own responsibility to protect the plaintiff because they had their own responsibility for safety, even in the light of the plaintiff and his co-employee, his colleague at the subcontractor, making these bad decisions to be working without proper fall protection, and so the case law doesn't turn on what the plaintiff did or didn't do in terms of their fault. It still goes back to what is IDCC or the general contractor's responsibility under 414 and premises liability. Thank you. Any questions? No. Well, both of you made very in-depth arguments. It's really kind of an interesting case, and I thank you both for your time and your effort.